| | |
|---|---|
| Jacqueline Niccolai, <br><br>　　　　　Plaintiff, <br><br>v. <br><br>Shepherds Baptist Ministries, Inc., <br><br>　　　　　Defendant. | CIVIL ACTION NO. 19-cv-851 <br><br><br> Jury Trial Demanded |

# COMPLAINT

**(Retaliatory Discharge, 31 U.S.C. § 3730(h); Common Law Wrongful Discharge)**

Plaintiff Jacqueline Niccolai, by and through her counsel, Mary C. Flanner and Paul Schinner of Cross Law Firm, S.C., complains and states as follows against Defendant Shepherds Baptist Ministries, Inc. (d/b/a Shepherds College):

## I.　　NATURE OF THE CASE

1. After Defendant Shepherds Baptist Ministries, Inc. hired Plaintiff Jacqueline Niccolai as its new Director of Financial Aid on or about January 15, 2018, Jacqueline Niccolai discovered what she believed in good faith to be multiple, systemic, intentional violations of regulations promulgated by the U.S. Department of Education (DoE), along with the corresponding false certifications of compliance and falsification of certain records to conceal the violations from DoE. Cognizant of the fact that compliance with such regulations was required in order for Defendant to receive federal funding under Title IV of the Higher Education Act ("Title IV"), Niccolai attempted to stop Defendant's fraudulent conduct and bring Defendant into compliance and refused directives to engage in record falsification.

1

2. Shortly thereafter, Shepherds Baptist Ministries, Inc. abruptly fired Niccolai without explanation. Defendant's true reason for terminating Niccolai was her repeated efforts to prevent Title IV fraud on the Government of the United States and her refusal to participate in the fraud. Defendant's actions thus constitute illegal retaliation under the federal False Claims Act, (FCA), 31 U.S.C. § 3730(h) and Wisconsin common law wrongful discharge.

## II. FEDERAL JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3730(h).

4. This Court has supplemental jurisdiction over the pendent state law claim pursuant to 28 U.S.C. § 1367(a).

5. The Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant provides services in this district, is headquartered in this district, and employed Plaintiff in this district

6. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendant's headquarters, operations, and employees are all located in this district.

## III. PARTIES

7. **Plaintiff Jacqueline Niccolai** is a citizen of the United States of America, and a resident of the City and County of Kenosha, State of Wisconsin. She worked for Shepherds Baptist Ministries, Inc. as an Advancement Officer and the Director of Financial Aid for Shepherds College from January 15, 2018 to May 24, 2018.

20. **Defendant Shepherds Baptist Ministries, Inc. (d/b/a Shepherds College)** is a Wisconsin non-stock corporation with a principal place of business located at 1805 15th Avenue, Union Grove, Wisconsin 53182. Its registered agent is Tracy N. Terrill at the same address.

## IV. FACTUAL BACKGROUND

20. Founded in 1964 as a boarding school for children with intellectual disabilities, Shepherds Baptist Ministries, Inc. eventually became an "adult ministry focused on vocational training," with Shepherds College officially opening in 2008 as a three-year, post-secondary occupational college exclusively for young adults with intellectual disabilities.

21. In 2012, Shepherds College obtained its first accreditation from the North Central Association of Colleges and Schools Council on Accreditation and School Improvement (NCA – CASI). When NCA-CASI ceased to accredit non-degree programs in or about 2014, Shepherds College obtained accreditation from the Council of Occupational Education ("COE") in or about the following year.

22. By obtaining and maintaining its accreditation, Shepherds College fulfilled one of the requirements of eligibility for receipt of federal student loan payments under Title IV.

23. In addition to obtaining accreditation, Shepherds College in 2012 executed a Program Participation Agreement ("PPA") with the DoE in which Shepherds College certified that it would maintain "a system to identify and resolve discrepancies in the information that the institution receives from different sources with respect to a student's application for financial aid," including "previous educational experience." 34 C.F.R. § 668.16(f).

24. In addition to and as part of its PPA, Shepherds College agreed to comply with Title IV recordkeeping requirements as well as regulations prohibiting misrepresentation and governing the reporting of clock hours for instructional time and the Student Academic Progress as well as the content, design, and reported results of gainful employment (GE) programs.

25. In 2018, the total cost for a student attending Shepherds College was over $45,000 per year with room and board.

26. For this cost, students can enroll in Shepherds College's purported "gainful employment" program, such as its 3-year "culinary arts certificate" program, which, according to Shepherds College's website, may equip graduates to become, inter alia, "dishwashers," "food servers," and "cafeteria attendants." Also, in 2018, obtaining Social Security Disability ("SSDI") or Supplemental Income ("SSI") was "Step 1" of Shepherds College's financial aid student guidance, further contradicting Shepherds College's independence and prospective employment claims.

27. William Amstutz was the President of Shepherds College from 1998 to May 2018, when Shepherds' Board of Directors selected Tracy Terrill as his replacement.

28. Since 2012, day-to-day operations at Shepherds College have been managed by Executive Director and Vice President of Operations, Tracy Terrill, who reported directly to Amstutz until April 2018, when Shepherds College announced that Terrill would soon be replacing Amstutz as President. On information and belief, Terrill's promotion was formalized by the Board of Directors in May 2018.

29. Reporting to Terrill during Plaintiff's employment were three other members of Shepherds College's "leadership team": Dean of Education, Angela Houk; Director of Student Recruitment and Placement, Brian Canright; and Dean of Students, Lori Konopasek.

30. In May 2018, Canright was promoted to Vice President of Expansion following his recruitment of Shepherds College's largest incoming class since being accredited.

31. Canright travels the country to recruit prospective students. This recruitment process melded with the Admissions and Financial Aid application process, once prospective students' parents confirm interest in having their child enroll.

32. Once a student is enrolled, he or she is assigned an advisor and has his or her courses scheduled by Dean of Education Angela Houk who, in coordination with Terrill, designs and oversees Shepherds College's various programs and curricula, which include over forty-five (45) staff members. Shepherds College employs "Advisor/Instructors" generally responsible for providing the educational services, as well as support staff, such as paraprofessionals and resident life workers.

## V.      DEFENDANT'S RETALIATORY CONDUCT

33. Plaintiff Jacqueline Niccolai had knowledge and experience in college financial aid and related DoE regulatory compliance before joining Shepherds College.

34. Prior to joining Shepherds College, Niccolai developed her knowledge and experience concerning DoE Title IV regulations while working for a large vocational college with campuses all over the country, where her involvement in a comprehensive overhaul of the college's accredited vocational curriculum resulted in her 2016 promotion to the position of Executive Director of the college's Milwaukee Campus.

35. In December 2017, Niccolai applied and interviewed with Terrill for the position of Shepherds College Director of Financial Aid for Shepherd's Baptist Ministries, Inc. She was offered and accepted the position in late December 2017 and commenced employment on or about January 15, 2018 as Director of Financial Aid for Shepherds College.

36. At the time she was hired, Niccolai was aware that intentional, material violations of DoE Title IV federal student loan program regulations can constitute fraud.

37. Immediately upon commencing employment at Shepherds College, Niccolai observed what she believed to be widespread, systematic, intentional Title IV compliance failures and corresponding record falsification related to (1) Shepherds College's verification of

5

students' Title IV eligibility; (2) Shepherds College's processes for documenting Student Academic Progress (SAP) and instructional time; (3) Shepherds College's representations to prospective students regarding financial aid and gainful employment prospects; and (4) Shepherds College's recruiting and enrollment process with regard to student loan applications.

38. Niccolai reasonably believed and was concerned that these failures could render Shepherds College ineligible to receive federal Title IV funds or constitute False Claims Act (FC) violations.

39. Niccolai was also concerned that these failures could result in intellectually disabled students unwittingly incurring thousands of dollars of student loan debt, in reliance on misrepresentations about the employment prospects of its graduates. For example, in 2018 Shepherds College falsely claimed that 90% of its graduates were gainfully employed.

40. The government loans made pursuant to Title IV include requirements that the loan recipients, i.e., the students, agree to repay loans made under that title.

41. Niccolai expressed her beliefs and concerns to Shepherds College's key management personnel repeatedly throughout her employment and took steps to stop and correct the fraudulent and noncompliant practices.

42. For example, in January 2018, Niccolai tried to discuss her role in verifying students' completion of "entrance counseling" for new students and first-time loan recipients as required under 34 C.F.R. § 685.304 with Terrill.

43. In response, Terrill informed Niccolai that Shepherds College does not require its students to complete loan entrance or exit counseling, because the students "wouldn't understand it." Similarly, addressing the risk of student loan default, Terrill explained to Niccolai, "*they don't need credit; they can go live with their parents*."

6

44. Nonetheless, Niccolai persisted, and on several occasions in early 2018 she presented Mr. Amstutz and Terrill with DoE documentation of the requirement that she, as Director of Financial Aid, needed access to the National Student Loan Data System ("NSLDS"), the DoE central database for student aid.

45. Amstutz would refer Niccolai to Terrill, who repeatedly refused Niccolai's requests for NSLDS access, thereby denying her the ability to verify students' completion of loan counseling as well as other important Title IV eligibility information.

46. When Niccolai proposed compliance with exit counseling for Spring of 2018 graduates, Terrill again denied Niccolai's request, saying "it would confuse them."

47. When Niccolai suggested that Shepherds College consider becoming a Title IV program specifically for intellectually disabled students, instead of holding itself out as the equivalent of any other vocational college, Terrill dismissed the suggestion immediately, because under such a program Shepherds College would be eligible for less federal funds.

48. Under 34 C.F.R. § 685.201, "to obtain a Direct Subsidized Loan or a Direct Unsubsidized Loan, a student must complete a Free Application for Federal Student Aid [FAFSA] application and submit it in accordance with instructions in the application."

49. An approximately 10-page document, the FAFSA application requires loan applicants to provide basic contact and financial information and specifically designates sections to be completed by the student-applicant and those that may be completed by the student-applicant's parent. The completed FAFSA is then used to calculate the total amount, and type(s), of federal financial aid the student-applicant is eligible to receive.

50. Once the FAFSA application is completed and the amount of aid offered is determined, the student-applicant must decide how much debt to take on and execute a Master

7

Promissory Note, which requires that student applicants sign "[u]nder penalty of perjury" a certification that they "promise to pay to [the Department of Education] all loan amounts disbursed under the terms of this MPN....I understand that by accepting any disbursement issued at any time under this MPN, I agree to repay the loan associated with the disbursement."

51. In addition, the student-applicant must likewise certify that they have "read" and specifically that they "understand" the "Borrower's Rights and Responsibilities Statement" attached to the Master Promissory Note, which contains basic information regarding loan repayment plans, forbearance, and discharge.

52. However, Shepherds College students themselves had no involvement in the process whatsoever.

53. In late January/early February 2018, Niccolai discovered that parents, at Shepherds College's direction, would forge their adult children's MPN signatures.

54. Still without NSLDS access to obtain information, Niccolai contacted the school's financial department and confirmed that the students were not receiving Parent Loan for Undergraduate Students (PLUS) loans and that the signatures were indeed forgeries.

55. Later that day or the next day in January or February 2018, Niccolai approached Canright to discuss formalizing and streamlining the verification of eligibility records and to ensure that she, as Director of Financial Aid, played a role in the new-student enrollment process. Canright dismissed her concerns and requests.

56. Niccolai then explained to Mr. Canright her concern that Title IV did not allow parents to forge student signatures on the FAFSA application or on the MPNs. Niccolai further urged that Shepherds College take the time to explain the documentation to the students and have them sign for their loans, as required by law.

8

57. In response, Canright reiterated that effectively directing parents to forge MPNs was routine practice at Shepherds College. He denied Niccolai's request, stating, "*I'm gonna have to go with 'no,'....the parents can sign because [the students] can't do it…it would be waste of time.*"

58. Also, in early January and into February of 2018, Niccolai discovered that Shepherds College did not have a Student Academic Progress ("SAP") policy or even a procedure for tracking students' clock hours, as required by Title IV.

59. Niccolai further discovered that Shepherds College had no such systems in place to track a student's progress when it first sought and received accreditation and entered into its PPA in 2012, nor did it have any intention of implementing such a system. When Niccolai asked Houk, who, along with Terrill, was largely responsible for obtaining accreditation and the PPA, where to find students' SAP records, Houk told her to "stop speaking to me in riddles and rhymes."

60. In early March 2018, DoE contracted auditor Webber & Associates contacted Shepherds with regard to a DoE compliance audit. Shortly thereafter, DoE Institutional Review Specialist Tammi Sawyer contacted Niccolai and Terrill about a recertification audit.

61. Before Sawyer reached out, Niccolai had spoken to Terrill about the impending audit(s) and told him which types of records she would need to gather from the Shepherds College Admissions Office and Education Department as part of the audit(s). Terrill stared at her blankly and said, "that's your job."

62. In reply, Niccolai explained that Federal Student Aid eligibility is an *institutional* responsibility, and that compliance accordingly required all the schools' departments to work together to maintain and make the necessary student records available. Terrill provided her with

9

no records. Canright told her to "track down" the records herself and refused her efforts to formalize and streamline eligibility documentation because it would "negatively impact" his all-important "recruiting" efforts.

63. Niccolai further stressed that SAP records would be a focus of the impending audit(s) by the DoE and its third-party administrator Webber & Associates as well as by Shepherds College's accreditor, the COE.

64. When Niccolai followed up with Terrill in April 2018 regarding her continued lack of access to SAP records for the audit, Terrill suggested that Niccolai "open up the grade books" and falsify the records.

65. Niccolai refused to do so. She informed Terrill that the belated creation of such records would constitute fraud. Niccolai then expressed her concern to Vice President of Advancement, Brian Page, who volunteered to be her "voice" and informed her that her compliance concerns and attempts to address them had "made a lot of people mad."

66. Falsification of SAP records and clock hours was not uncommon at Shepherds College. For example, when a Shepherds student who was also the child of a Shepherds executive missed classes to attend a wedding, he was simply allowed to "make-up" the hours during Spring Break despite the fact that Shepherds College was closed during Spring Break, with no instructors available to provide make-up instruction. Thus, the student was assigned tasks such as sweeping and other mundane or janitorial tasks during his SAP "make-up" time.

67. When Niccolai explained the DoE regulations to Houk regarding make-up time—including the fact that make-up time must be regularly scheduled, available to all students, and include actual instruction,—, Houk confirmed that Shepherds did not comply with that regulation by stating, "we can't afford to do that."

10

68. On or about March 23, 2018, shortly after refusing to falsify Title IV-required records at Terrill's direction after pointing out Shepherds College's SAP failures, Niccolai was reprimanded by Terrill for allegedly, according to Terrill's typed notes, "overstepping and encroaching into various staff members areas of responsibility" as well as for expressing "criticism" of Shepherds College's existing Financial Aid process, its "[d]isorganization of files," and for criticizing its former Financial Aid Director and "why he did certain things." In the same reprimand, Terrill rebuked Niccolai for explaining "what should have been done" with regard to Shepherds College's financial aid processes and procedures.

69. In seeking to confirm what, if any, SAP records Shepherds College had properly maintained, Niccolai discovered that Shepherds College also failed to track its students' clock hours. While students had badges for "clocking" in and out of class, Shepherds College, despite its purported dedication to independence, did not want its students to log their hours independently.

70. To track students' progress, Title IV-funded "post-secondary vocational" institutions under 34 C.F.R. § 668.6, like Shepherds College, must track and record students' "clock hours," defined by 34 C.F.R. § 600.2 to include a "50- to 60-minute class, lecture, or recitation in a 60-minute period."

71. Thus, Niccolai found that Shepherds College manipulated Title IV's clock hour system by having advisors/instructors log students' maximum hours for them, regardless of whether those students actually received that instructional time. As a result, each student had "perfect attendance" of 25 hours per week, as "verified" by the SAP records Shepherds College purportedly provided to the Department of Education, its auditor, and its accreditor.

72. When Niccolai asked Houk about accessing clock hour records, Houk replied by stating "I don't keep track of the hours, you do."

73. The DoE audit also required Shepherds College to verify the basic eligibility requirements of students, such as with high school diplomas and transcripts.

74. When Niccolai explained to Terrill that she needed access to Admissions Office records in order to verify these basic eligibility requirements, Terrill tersely instructed Niccolai to "figure out a way to make it verified."

75. Next, Niccolai spoke to Canright, who directed her to a spreadsheet he maintained, purportedly to track the eligibility verification of prospective students. The spreadsheet indicated that 100% of the incoming twenty-eight (28) students had verified high school diplomas or transcripts.

76. In May 2018, Niccolai visited Shepherds College's Office of Admissions to view the physical student files herself and found that in many cases, files did not exist.

77. For those student files that did exist, Niccolai identified multiple missing documents, including basic identification information, as well as documents labeled as high school transcripts that were not actually high school transcripts. A student's mom explained to Niccolai that Canright had directed her to create a false transcript.

78. Niccolai did not discover precisely how Shepherds College convinced parents to engage in the widespread falsification of eligibility and loan documentation until early May 2018, when, during a call to verify high school graduation and other financial aid eligibility data, the mother of a student with Title IV loans asked Niccolai whether it was "true" that intellectually disabled students are entitled to automatic loan forgiveness.

79. During the same conversation, Niccolai explained to the student's mother that discharge is only a possibility under certain circumstances, and the mother indicated she thought that discharge was a certainty because of the student's disability. When Niccolai asked her who told her that, the student's mother explained that Canright had advised her to "just take all the loans" because "they'll forgive them" and that there was "disability forgiveness."

80. Niccolai immediately informed Terrill of this, who indicated that he was aware of this aspect of Mr. Canright's misleading sales pitch and that he did not want anyone talking about it.

81. In an April 26 email, Niccolai expressly warned Terrill that Shepherds College could "get in trouble" if it persisted in its unwillingness to establish legitimate eligibility verification procedures. Terrill replied by directing Niccolai to "hunt them [the documents] down" after-the-fact.

82. On April 28, 2018, Niccolai emailed multiple attachments to Shepherds College Vice President of Advancement Brian Page, along with a PowerPoint, explaining Title IV verification and SAP requirements. She never heard back, and no related procedures were implemented.

83. On May 10, 2018, Mr. Canright emailed Niccolai that he would be handling a financial aid presentation to students instead of Niccolai because he had a five (5) point presentation, created by Terrill, and "therefore you will not be presenting." Incredulous, Niccolai replied minutes later asking "You don't think it would be beneficial for me to explain [Financial Aid] and the process?" Mr. Canright confirmed that he did not.

84. On May 14, 2018, Niccolai sent additional attachments to Vice President Page containing a full explanation of Student Admissions Process regulations from the DoE's Federal Student Aid handbook.

85. In early-to-mid May 2018, Houk asked Niccolai to provide a "basic finance course" to graduating students. When Niccolai opened her presentation by asking a room of approximately twelve (12) students "how many of you have student loans?" or something to that effect, not one student raised his or her hand. Eight of the twelve students in the classroom were in fact receiving Title IV financial aid.

86. Concerned, Niccolai created a DoE-required checklist for those students who would be graduating. The checklist included reference to exit-loan counseling and other financial aid-related information, such as completion of all SAP hours, make-up work, and payment of any tuition or fee balances with Shepherds' business office.

87. The next week, the Department of Education representative handling the recertification audit indicated, in an email to Terrill, that she would like to speak with Niccolai concerning Shepherds College's responses to the audit.

88. Around the same time, Terrill learned of Niccolai's checklist when a parent faxed the completed checklist form back to Shepherds. Angry that students and parents were being asked basic questions about financial aid, Terrill circulated an email demanding to know who had created the checklist. When Niccolai confirmed in a reply email that she had created the document as a part of her duties as Director of Financial Aid, Terrill demanded to know "why." Niccolai politely explained why in a reply. Terrill made no immediate response.

89. A week later, Terrill summoned Niccolai to a meeting and summarily terminated her employment with Shepherds College without providing any reason.

14

Case 2:19-cv-00851-PP   Filed 06/07/19   Page 14 of 17   Document 1

## VI. COUNTS

### COUNT ONE

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)

### RETALIATION AGAINST PLAINTIFF

90. Plaintiff Niccolai re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

91. 31 U.S.C. § 3730(h), provides, "(1) Any employee... shall be entitled to all relief necessary to make that employee... whole, if that employee is... discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee... in furtherance of, other efforts to stop one or more violations of this subchapter."

92. Niccolai was discriminated against in the terms and conditions of her employment when her repeated attempts to stop Defendant from committing material Title IV regulatory violations and related falsification of records submitted in support of Shepherds College's continued receipt of Title IV funds, were met by Defendant with a retaliatory and perpetual reprimand and ultimately a discharge.

### COUNT TWO

### WISCONSIN COMMON LAW PUBLIC POLICY EXCEPTION TO AT WILL EMPLOYMENT DOCTRINE

### WRONGFUL DISCHARGE

93. Plaintiff Niccolai re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

94. Wisconsin common law recognizes a "public policy exception" to the employment at will doctrine whereby a "wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest" and "the employee is terminated for refusing a command, instruction, or request of the employer to violate public policy as established in existing law." *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 664-65, 571 N.W.2d 393, 396-97 (1997).

95. Niccolai was terminated for refusing Shepherds College's commands, instructions, and requests that she violate or assist the violation of Title IV regulations.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the United States are entitled to damages from Defendant in accordance with the provisions of 31 U.S.C. § 3730(h), and, in the alternative, Wisconsin common law. Plaintiff requests that judgment be entered against Defendant, including that:

a. Plaintiff be awarded 2 times the amount of back pay, interest on the back pay, reinstatement or front pay in lieu of reinstatement, and compensation for any special damages sustained as a result of the discrimination, including damages for emotional distress, pain and suffering, punitive damages, and litigation costs and reasonable attorneys' fees pursuant to 31 U.S.C. § 3730(h);

b. Plaintiff be awarded, in the alternative, all consequential damages under Wisconsin common law, including past and future lost wages and benefits;

c. Plaintiff be granted all such other relief as the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF DEMANDS THE ABOVE ENTITLED ACTION BE TRIED TO A 12-PERSON JURY.**

16

Case 2:19-cv-00851-PP   Filed 06/07/19   Page 16 of 17   Document 1

Respectfully submitted and dated this 7ʰ day of June 2019.

                Attorneys for
                Plaintiff Jacqueline Niccolai
                **Cross Law Firm, S.C.**

                By: s/ Mary C. Flanner
                  Mary C. Flanner
                  SBN # 1013095
                  Paul Schinner
                  SBN # 1093983

                **Cross Law Firm, S.C.**
                Lawyer's Building
                845 North 11ᵗʰ Street
                Milwaukee, WI 53233
                Phone: (414) 224-0000
                Fax: (414) 273-7055
                Email: mflanner@crosslawfirm.com
                    schinner@crosslawfirm.com